# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROSEMARY KELLY, )<br>)<br>Plaintiff, )<br>) No. 13-cv-03701<br>v. )<br>) Judge Andrea R. Wood<br>DEPARTMENT OF HUMAN SERVICES, )<br>)<br>Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosemary Kelly is an African-American nurse who has been employed by Defendant Department of Human Services ("DHS") since 2004 and has reported to the Shapiro Center ("Shapiro") since 2010. In January 2010, Kelly suffered an injury at work and, as a result, requested a light-duty assignment. Kelly claims that during her subsequent period of light-duty assignment, she was subjected to race discrimination, disability discrimination, and harassment. Accordingly, Kelly has sued DHS under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*. Before the Court is DHS's motion for summary judgment. (Dkt. No. 79.) For the reasons discussed below, DHS's motion is granted.

# BACKGROUND[1]

On January 11, 2011, Kelly fell at work, injuring her back, neck, and shoulder. (Def.'s Resp. Pl.'s Stmt. Add'l Undisputed Facts ("DRPAUF") ¶ 2e, Dkt. No. 103.) At the time, Kelly was working as a nurse for DHS at the Shapiro Center. (Def.'s Stmt. Undisputed Facts ("DSUF") ¶ 6, Dkt. No. 81; DRPAUF ¶ 2a.) Specifically, Kelly worked in Unit 603, where she was responsible for the direct treatment and care of over 100 patients with severe medical issues and more extensive medical needs. (DSUF ¶ 8.) Kelly reported her injury to her supervisor, Cara Johnston. (*Id.* ¶ 9.) Following her fall, Kelly took approximately two weeks off from work. (DRPAUF ¶ 3a.) Kelly's doctor approved her return to work, so long as the following work

---

[1] As an initial matter, the Court notes that Kelly has failed to comply with the Local Rules governing summary judgment in several respects. Perhaps most significantly for present purposes, Kelly has failed to respond properly to DHS's Rule 56.1 Statement of Uncontested Facts (Dkt. No. 81). In her own "Statement of Facts Pursuant to Rule 56.1," Kelly declares in a single sentence that she "disputes the defendant's contention that the document filed in support of their motion for judgment . . . . contains only contested [sic] facts." (Dkt. No. 91 at 1.) She then proceeds to provide a summary of the deposition testimony in the case. However, pursuant to Local Rule 56.1(b)(3), Kelly's response to DHS's Rule 56.1 Statement was required to contain "a response to ***each numbered paragraph*** in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(a) (emphasis added). "An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission." *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (noting that the plaintiff's failure to respond appropriately to the defendant's Local Rule 56.1 statement resulted in the defendant's statements of fact being deemed admitted). Accordingly, the Court accepts DHS's statements of fact as admitted by Kelly.

In addition, DHS argues that Kelly's response brief should be stricken for violating Local Rule 7.1, which places a 15-page limitation on briefs unless the court grants leave to exceed that limit. The rule expressly warns that "[a]ny brief or objection that does not comply with [Rule 7.1] shall be filed subject to being stricken by the court." N.D. Ill. L.R. 7.1. DHS further contends that Kelly's brief violates Local Rule 5.2, which requires line-spacing of at least 2.0 lines. N.D. Ill. L.R. 5.2. Indeed, without leave of court, Kelly filed a 19-page response brief with spacing of less than 2.0 lines. The Court would be justified in striking the excess pages. But doing so would eliminate much of Kelly's argument regarding the alleged disability discrimination. The Court views that as an unnecessarily harsh result and instead reminds counsel that such a long, tightly-spaced brief violates the Local Rules.

restrictions were followed: minimal standing and walking, no squatting or working heights, no stairs, and no lifting over 10 pounds. (DRPAUF ¶ 3c.)

Pursuant to her doctor's orders, Kelly requested a light-duty assignment upon returning to work. (DRPAUF ¶ 2c.) Accordingly, on January 25, 2011, Kelly signed a Work Accommodation Program Agreement that states: "[t]he employee has been approved for participation in the Restricted Duty Program and will be accommodated and provided with tasks within the physical restriction placed upon the employee by his/her physician. Listing of appropriate tasks are attached." (DSUF ¶ 14.) The Work Accommodation attachment further states that "<u>ANY</u> duty can be assigned that is within documented restrictions." (*Id.* ¶ 17 (emphasis in original).) Some of the light-duty tasks included on the checklist are answering phones, typing, light copy machine operation, light filing, delivering mail, clothing repair, and assisting in the preparing of files. (DSUF Ex. 7 at 2, Dkt. No. 81-8.) During the time she was on light duty, Kelly reported to Director of Nursing Kim Larson (DSUF ¶ 20.) According to Larson, light-duty designations were prioritized and appointed based on the residents' needs and the facility's needs. (*Id.* ¶ 20.)

When Kelly returned to work on January 25, 2011, she was assigned to finish paperwork that had been in process in her unit at the time of her injury. (*Id.* ¶ 21.) Several weeks later, on February 14, 2011, Kelly was moved to Unit 100 to perform filing and purging of medical records. (*Id.* ¶ 22.) While she was working on filing, Kelly was supervised by Jackie Coulman. (*Id.*) On the day she was assigned to work in Unit 100, Kelly called Larson and said that the records were too heavy for her to lift. (*Id.* ¶ 23.) In response, Larson told Kelly to ask for assistance with the records when needed. (*Id.*) A little over a week later, on February 24, 2011, Kelly returned to her doctor due to back pain and shoulder issues. (*Id.* ¶ 24.) When Kelly came back to work on February 25, 2011, her doctor had provided the following, updated restrictions:

3

no climbing stairs or ladders, no operating mobile equipment, no lifting over 10 pounds, no repetitive bending at the waist, no kneeling or crawling, no squatting, no use of the right shoulder, and limited walking. (*Id.*) Upon returning to work with these new restrictions, Kelly told Larson that she could not lift and open the records as needed to complete her assignment in Unit 100. (*Id.* ¶ 27.) Nonetheless, Kelly continued to purge documents but with Coulman and another nurse assisting her in pulling and opening the records. (*Id.* ¶ 28.) But according to Kelly, Coulman sometimes refused to assist her in lifting records and, occasionally, Coulman told Kelly that the charts were not too heavy for Kelly to lift. (*Id.* ¶ 64.) Kelly also claims that Coulman complained to Larson regarding Kelly's work performance. (*Id.*)

On March 18, 2011, Coulman told Kelly that the filing was completed and instructed Kelly to report to the Dietary Department. (*Id.* ¶ 35.) On March 21, 2011, Kelly reported to the Dietary Department as requested and was assigned to count silverware and put the utensils into containers. (*Id.* ¶¶ 37, 38.) About an hour and a half into her new assignment, Kelly complained that the stool on which she was sitting was hurting her back. (*Id.* ¶ 40.) Kelly claims that she told David Casteel, the Dietary Manager, about her discomfort, and he told her that her "doctor's note does not say that [she couldn't] sit on the stool." (*Id.* ¶ 65.) Kelly was then moved to the break room to put sack-lunch labels on paper bags, an assignment that allowed her to sit in a chair with a back on it. (*Id.* ¶ 41.) Kelly continued to work in the Dietary Department for the remainder of the week. (*Id.* ¶ 35.) At some point, Kelly found out that Casteel had posted her doctor's note with her diagnosis and other personal information on the communications bulletin board. (*Id.* ¶ 65.) The doctor's note was posted for approximately a week, and Kelly complained about it a couple of times before it was taken down. (*Id.*)

After that week in the Dietary Department, Kelly was supposed to meet with Larson on Monday, March 28, 2011 to discuss her light-duty assignments. On the morning of the meeting, however, Kelly called Larson and told her that it was too difficult for her to make it up the ramp to Larson's office. (*Id.* ¶ 48.) Larson told Kelly that walking up the ramp was within her physical restrictions, but Kelly again stated that it was too hard. (*Id.* ¶ 49.) According to Larson, after discussing Kelly's lack of compliance with a worker's compensation coordinator and the human resources director, Larson instructed Kelly to go home. (*Id.* ¶ 50.) According to Kelly, Larson told her she was being sent home because Larson did not have any more light-duty work for her to perform. (*Id.* ¶ 51.) Kelly also claims that on at least three occasions Larson told her that "she was not going to have [Kelly] working in there, getting paid for a nurse's salary and not able to do nurse's work." (*Id.* ¶ 63.) On March 30, 2011, Kelly requested and was granted a medical leave of absence from which she has yet to return. (*Id.* ¶ 53.)

According to Kelly, while she was given light-duty assignments in the Dietary Department, Karen Krout, a white coworker, was allowed to perform light-duty nursing tasks, even though she had the same restrictions as Kelly. (*Id.* ¶ 60.) Krout was injured at work on March 22, 2011 and returned to her normal job duties on March 23, 2011. (*Id.* ¶¶ 68–69.) On March 24, 2011, Krout underwent a health exam and was provided with the following work restrictions: maximum lift of 10 pounds, occasional lift, occasional push and pull, occasional bending, and alternate sitting with standing. (*Id.* ¶ 71.) However, Krout never requested light duty during her employment because she did not feel it was necessary. (*Id.* ¶¶ 70, 73.)

On September 7, 2012, Kelly filed a charge of discrimination against DHS with the United States Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race and disability. (*Id*. ¶ 78.) On February 20, 2013, the EEOC mailed Kelly a Notice

of Right to Sue. (*Id.* ¶ 79.) On May 17, 2013, Kelly commenced an action in this Court for employment discrimination arising out of her employment with DHS. (*Id.* ¶ 80.)

## DISCUSSION

When considering a motion for summary judgment, the Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). But "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (internal citation and quotation marks omitted). The "mere existence of *some* alleged factual dispute" does not suffice to defeat a motion for summary judgment. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal citation and quotation marks omitted) (emphasis in original). Rather, summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the applicable substantive law." *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 842 (7th Cir. 2004) (internal citation and quotation marks omitted). The genuineness of a dispute suffices to defeat a motion for summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal citation and quotation marks omitted).

### I. Timeliness

The Court first considers DHS's argument that Kelly's claims are untimely because she failed to file her charge of discrimination with the EEOC regarding the alleged misconduct within the statutory 300-day window.

Kelly's complaint alleges violations of Title VII and the ADA. Title VII makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race. 42 U.S.C. § 2000e-2(a)(1). Under Title VII, a plaintiff in Illinois must file an employment discrimination charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." *Id.* at § 2000e-5(e)(1); *see also See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002). The ADA, meanwhile, prohibits a "covered entity" from discriminating against a qualified individual with a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" 42 U.S.C. § 12112(a). The ADA's enforcement provision incorporates § 2000e-5 of Title VII, and therefore claims for discrimination under the ADA must also be filed within 300 days "after the alleged unlawful employment practice occurred." § 2000e-5(e)(1); *see also Teague v. Nw. Mem'l Hosp.*, 492 Fed. App'x. 680, 684 (7th Cir. 2012) ("A plaintiff in Illinois, a 'deferral state' because it has a state agency with enforcement powers parallel to those of the EEOC, must file a charge of discrimination with the EEOC within 300 days of some offending conduct."). Claims based on alleged discriminatory acts that do not fall within the relevant 300-day period are generally untimely. *See Fairchild v. Forma Sci. Inc.*, 147 F.3d 567, 574 (7th Cir. 1998); *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995).

An unlawful employment practice "occurs" on the date of the discrete act of discrimination. *See Nat'l R.R. Passenger Corp.,* 536 U.S. at 110–11; *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) ("If a plaintiff does not file a charge concerning a discrete act of discriminatory conduct within 300 days of its occurrence, his claim is time-barred

and he may not recover."); *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004) ("Under the notice rule, the 300-day limitations period commences at the time the employment decision was made and communicated to the employee." (internal quotation marks and alteration brackets omitted)). Here, DHS's allegedly unlawful employment practices began on January 25, 2011—*i.e.*, the day Kelly returned to work following her back injury. On March 28, 2011, Larson sent Kelly home. On March 30, 2011, Kelly requested and was granted a medical leave of absence effective March 31, 2011. Thus, Kelly's employment discrimination claims accrued, at the latest, on March 28, 2011. After that, Kelly had 300 days, *i.e.*, until January 22, 2012, to file her EEOC charge. Instead, Kelly waited until September 7, 2012, more than seven months after the deadline, to file her discrimination charge.

Kelly argues that the continuing violation doctrine applies here to bring her claims within the statutory time period. This Court is unpersuaded. The Seventh Circuit has made clear that "[t]he doctrine applies to claims like sexual harassment, where an individual act cannot be made the subject of a lawsuit when it occurs because its character as a violation did not become clear until it was repeated during the limitations period." *Stepney*, 392 F.3d at 240; *see also Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (noting that the purpose of the continuing violation doctrine "is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought"). The "doctrine is applicable only if it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct." *Filipovic v. K & R Exp. Sys., Inc.,* 176 F.3d 390, 396 (7th Cir. 1999) (internal quotation marks omitted). Discrete, concrete acts that are immediately identifiable may not benefit from the continuing violation doctrine. *Place v. Abbott Labs.*, 215 F.3d 803, 808 (7th Cir. 2000); *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges . . . . [E]ach discrete discriminatory act starts a new clock for filing charges alleging that act.").

Kelly contends that because there was no specific date on which DHS informed her that she would not be accommodated with a work modification and because DHS never rejected outright the possibility that she could return to work, DHS's violation continues even until the present. But a "failure to remedy an unlawful employment action is not a discrete actionable violation." *Stepney*, 392 F.3d at 240 ; *see also Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 836–37 (7th Cir. 2008) ("That the June 2003 discriminatory act continues to affect [plaintiff] negatively does not breathe new life into [plaintiff's time-barred] claim . . . ."); *Hildebrandt v. Ill. Dep't of Nat. Res.* 347 F.3d 1014, 1029 (7th Cir. 2003) (holding that "a refusal to rectify time-barred violations . . . does not constitute an actionable wrong"). Accordingly, Kelly's claims are not rendered timely by the continuing violation doctrine. Because Kelly waited for more than 300 days before filing her EEOC charge, any lawsuit based on that conduct is untimely and must be dismissed. But even if Kelly's claims were timely, she has still failed to present a genuine dispute of material fact sufficient to survive a summary judgment motion, as explained below.

**II. Merits**

**A. Race Discrimination Claim**

To establish a *prima facie* case of discrimination, the plaintiff must present "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 762 (7th Cir. 2016). In assessing this question, the Court may use the "burden-shifting framework" set out in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). *Id.* at 766. But *McDonnell Douglas* is not the only way to assess evidence of discrimination. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination").[2] As explained in *Ortiz*, the Court may also simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 846 F.3d at 224.

Kelly's primary evidence of discrimination is that a white employee with a ten-pound weight restriction was allowed to work in the nursing unit. "[T]o prevail by showing differential treatment of a similarly[-]situated employee, a plaintiff must identify a comparator who is directly comparable to her in all material respects . . . to eliminate other explanatory variables." *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 626 (7th Cir. 2016) (internal quotations marks omitted) (alteration in original). But Krout is not comparable to Kelly in all material aspects. Unlike Kelly, Krout never worked light duty. Under DHS-Shapiro policies and procedures, if an employee felt unable to return to regular duty following an injury, she could seek a light-duty position on a temporary basis. Yet Krout never requested, never was assigned, and never performed light-duty work during her employment with DHS-Shapiro. Instead, Krout returned to her normal job duties reporting to her direct supervisor. There is no evidence that Krout's direct supervisor or Larson was even aware that Krout had a ten-pound weight restriction from March 24, 2011 to April 5, 2011. In contrast, Kelly sought and was approved for a

---

[2] "Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David*, 846 F.3d at 225 (internal quotation marks omitted).

10

temporary light-duty assignment. Furthermore, in addition to the ten-pound restriction, Kelly also required a sedentary position and could not use her right arm. These material differences between the two employees prevent Kelly from arguing that she was treated differently when all things were "in fact equal." *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008).

Even though no reasonable jury could find that Kelly was discriminated against by comparing her to Krout, the question remains whether a reasonable jury could nonetheless find that Kelly's assignment to filing and dietary unit tasks, rather than assignments within the nursing unit, was based on her race. Here, Kelly's Work Accommodation Agreement states, "<u>ANY</u> duty can be assigned that is within documented restrictions." Additionally, Larson prioritized light-duty assignments based on the needs of the residents and facility. Assigning Kelly to sort files and silverware was within the limits of the Work Accommodation Agreement and Larson's stated policy. Further, to the extent Kelly believes those assignments were demeaning, she has not produced any evidence to show that other, better assignments meeting the needs of her accommodation were available. Finally, there is no evidence that any employee at DHS or Shapiro ever expressed any racial animus or bias towards Kelly. Indeed, the only purported direct evidence of racial bias identified by Kelly consists of a statement Larson made during her deposition in which she stated that one-third of the nursing staff is Filipino. Later in the deposition, Larson corrected her testimony, stating that she is not sure if those nurses were Filipino versus of other Asian origin. But this testimony does not constitute a racially-discriminatory statement. And even if Larson had made a racially-charged statement regarding Asian-Americans, it is difficult to see how such a statement would help Kelly, who is African-American.

In short, even if Kelly had not failed to timely file her race discrimination charge, her claim would fail on the merits at the summary judgment stage.

## B. Disability Discrimination Claim

The same holds true for Kelly's disability discrimination claim. The ADA prohibits discrimination against "a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). To determine whether someone is a "qualified individual," the Court assesses two factors. First, "'whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015) (quoting *Basith v. Cook Cty.*, 241 F.3d 919, 927 (7th Cir. 2001)). Second, the Court assesses "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Stern*, 788 F.3d at 285 (quoting *Basith*, 241 F.3d at 927); *see also Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002). The parties do not dispute that Kelly possessed the necessary job qualifications, so the Court turns to the second factor.

In determining the essential functions of a job, the Court considers "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Gratzl v. Office of the Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010). In resolving whether a particular duty is an essential function, "the employer's judgment is an important factor, but it is not controlling . . . [Courts] also look to

12

evidence of the employer's actual practices in the workplace." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011).

During her time at DHS-Shapiro, Kelly was assigned to Unit 603, where she was responsible for the treatment and care of over 100 patients with severe medical issues. Her responsibilities included administering medication, drawing blood, doing treatments, documentation, maintaining medical records, attending meetings with patient care plans, attending to medical emergencies, performing CPR, assisting patients to transfer, feeding patients, creating care plans, doing quarterly assessments, and other tasks. According Kelly's supervisor, Cara Johnston, a nurse who works directly with patients must be able to perform lifesaving duties. But once Kelly became disabled, she could not lift over ten pounds, required a sedentary position, could not perform repetitive bending, and could not use her right arm. Based on the employer's job description, attending to medical emergencies is an essential function of a nurse's position. Encompassed within that core nursing responsibility are tasks like performing CPR. It is difficult to imagine how, without the use of her right arm, Kelly could perform such emergency medical tasks, especially if she also could not lift over ten pounds with her left arm. Furthermore, according to Kelly, about twenty percent of her job as a nurse involved lifting and forty percent involved bending or stooping. Therefore, a significant amount of her job involved work that Kelly could not perform because of her disability.[3] So according to Kelly herself, she could not perform her nursing duties with or without an accommodation. Therefore, Kelly has

---

[3] Kelly argues that some of her nursing duties can be performed within her restrictions, such as paperwork, maintaining medical records, and patient care. However, "an employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee." *Gratzl*, 601 F.3d at 680. Accordingly, DHS is not required to strip the nursing position of some of its core duties in order to accommodate Kelly's disability and create a new position for her.

not presented sufficient evidence from which a jury could conclude that she is a qualified individual under the ADA.

### C. Hostile Work Environment Claim

According to her complaint, the harassment Kelly experienced because of her disability created a hostile work environment. "Hostile work environment claims are typically associated with sexual harassment rather than disability claims." *Silk v. City of Chi.*, 194 F.3d 788, 803 (7th Cir. 1999). Indeed, the Seventh Circuit has "not decided whether allowing a hostile work environment is actionable under the ADA." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). For present purposes, however, the Court proceeds on the assumption that a hostile work environment claim is cognizable under the ADA. To prove such a hostile work environment claim, Kelly must follow the methodology established in the parallel area of Title VII litigation. *See Silk*, 194 F.3d at 804. "Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

Notably, the law "does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998). As such, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Silk*, 194 F.3d at 807 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal quotation marks omitted). A workplace rises to the level of an objectively hostile work environment only if it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). "[T]he threshold for plaintiffs is high, as the workplace that is actionable is one that is hellish." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks omitted).

Pursuant to the Work Accommodation Program Agreement, Kelly acknowledged that she could "be assigned in other than his/her regular position to perform the tasks indicated in the attached list." (DSUF ¶ 16.) The list of light-duty tasks attached to the agreement states that "<u>ANY</u> duty can be assigned that is within documented restrictions." (*Id.* ¶ 17.) And from February 14, 2011 until March 18, 2011, Kelly was assigned to help with nursing work of filing and purging medical records. Because she complained of pain associated with pulling and opening the records, Kelly was provided with assistance in her filing and purging work. Then, from March 21, 2011 to March 25, 2011, Kelly was assigned to the Dietary Department, where she counted silverware and put lunch labels on paper bags. According to Kelly, those assignments constituted harassment because they were non-nursing related and fell outside of her work restrictions. But based on the undisputed facts, Kelly was not required to do anything outside of her restrictions; instead, she was offered assistance when her work strayed outside of her restrictions, and she was told to notify Larson if she was having any issues. Further, even if Kelly found working in the kitchen to be humiliating, the assignment lasted only for one week and did not come with any kind of pay downgrade. Overall, no reasonable jury could find that the fact that Kelly was assigned to purge files and perform kitchen work created a workplace so permeated with discriminatory intimidation as to alter the terms of her employment.

Kelly also claims harassment based on the following alleged statements and incidents: (1) Larson stated on three occasions that she did not want Kelly working in the nursing

15

department and getting paid a nurse's salary, when she was not able to do nurse's work; (2) Coulman complained to Larson about Kelly's work performance; (3) occasionally Coulman told Kelly that certain medical charts were not, in fact, too heavy for Kelly to lift; (4) in response to Kelly's complaints about back pain from sitting on a stool, Casteel told her that her doctor's note does not say she could not sit on a stool; and (5) Casteel posted Kelly's doctor's note with her diagnosis and personal information on the communications bulletin board.

The Seventh Circuit has directed district courts not to "carve up incidents of harassment and then separately analyze each incident by itself, to see if each rises to the level of being severe or pervasive." *Mason v. S. Ill. Univ. of Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000). Instead, the Court must look at the totality of the circumstances. *Hall v. City of Chi.*, 713 F.3d 325, 331 (7th Cir. 2013). Even considering all the alleged harassment together and drawing all inferences in Kelly's favor, the Court finds that no reasonable jury could conclude that Kelly's work environment was so objectively hostile that it rose to the level of being "hellish." *Whittaker*, 424 F.3d at 645. The allegedly harassing conduct was infrequent and occurred over the course of a little over a month. And instead of showing truly outrageous comments and conduct, Kelly has, at best, shown a handful of insensitive and passive aggressive coworkers. This is not sufficient to sustain a hostile work environment claim.

## CONCLUSION

For the reasons discussed above, DHS's motion for summary judgment (Dkt. No. 79) is granted.

ENTERED:

Dated: November 15, 2018

_____
Andrea R. Wood
United States District Judge